### MUNSON INLAND WATER LINES, Inc., v. SEIDL.
### No. 5211.

Circuit Court of Appeals, Seventh Circuit.
June 25, 1934.

Kenneth E. Smart and Victor D. Werner, both of Milwaukee, Wis., for appellant.

Maxwell H. Herriott, of Milwaukee, Wis., Thomas H. Sanderson, of Sturgeon Bay, Wis., and Eric W. Passmore and Charles H. Galin, both of Milwaukee, Wis., for appellees.

Before ALSCHULER, EVANS, and SPARKS, Circuit Judges.

EVANS, Circuit Judge.

This appeal is from a decree in admiralty ordering the sale of the Steamship Schuyler and three consort barges to satisfy the claims of twelve libellants. Appellant, the owner of the steamship and barges, challenged, in the District Court as well as here, the allowability of the claims filed by the various libellants. It does not question the amount of any claim, if liability therefor exists.

The facts: On November 3, 1933, the Steamship Schuyler, while on a trip from New York to Chicago with a cargo, was grounded off the Wisconsin shore of Lake Michigan near Marinette. Most of the claims arose out of the operations undertaken to release the vessel. The steamship was sold by the marshal. Funds on hand available for distribution are not sufficient to pay all claims in full.

Appellant owned the Schuyler and as such owner, under a conditional sales contract, sold the same to one Hess, and the National Steam Barge Line Corporation was immediately organized to take over and operate the vessel. It was in charge of the boat when it grounded. Material provisions of the conditional sales contract are set forth in the margin.*

The purchaser had defaulted on the notes before any libel was filed. The vessel was enrolled in the port of New York, appellant being named as the owner, and the certificate of enrollment was on the vessel among its papers. The conditional sales contract was nowhere recorded, nor was there any evidence of it among the ship's papers.

Four questions are argued: (a) In view of the terms of the conditional sales contract, was the master in charge of the steamer authorized to pledge the credit of the steamer for necessary repairs, supplies, towage, salvage and wrecking operations? (b) Were libellants required to make inquiry to ascertain the authority of the master of the ship to bind the steamer for salvage services? (c) Were the libellants Seidl and Angwall, whose claims arose out of salvage work, barred from asserting maritime liens because of an agreement providing for the salvor's compensation made by Captain Clarke with libellants? (d) Are the salvage claimants

---

* "Purchaser agrees to purchase said vessels on the following terms and conditions: * * *

"(a) Twelve Hundred Dollars ($1200.00) at the time of the signing of this agreement, either in cash or by check.

"(b) The remaining twelve thousand ($12,000.00) to be paid by ten promissory notes, each in the sum of Twelve Hundred Dollars ($1200.00), executed by the company the purchaser is now in process of forming to own the vessels, each bearing the date of this agreement, and payable in the amount and upon the dates hereinafter set forth, with interest at the rate of 6% per annum. * * *

"(e) Such bills of sale to be made by the Seller and delivered to the Purchaser upon completion of the payment of the purchase price, shall convey title to each of said vessels 'as is, where is,' but must contain the usual warranty that they are free, and clear of all liens as of the date of this agreement, but subject to such liens, if any, as may be created during the time they are in the possession of the purchaser, and it is agreed that the said bills of sales be executed by the seller at the time of the signing of this contract, and the same be deposited with the Seller's attorney in escrow for which the Purchaser is to get a written evidence of such deposit.

"(f) The Purchaser hereby undertakes and agrees to keep said vessels free and clear of liens throughout the period they may be in his possession, and while the title thereto remains in the Seller.

"It is understood and agreed that the Purchaser may have and take possession of the said vessels upon the execution of this Agreement, but subject to all of its terms, conditions and provisions."

entitled to priority over other claimants in the disposition of the proceeds of sale?

(a) All libellants are agreed that the first question should be answered in the affirmative. Appellant, however, argues that the vendee under the conditional sales contract was not authorized to create voluntary liens. In support of its position, United States v. Carver, 260 U. S. 482, 43 S. Ct. 181, 67 L. Ed. 361; United States v. Robins Dry Dock & Repair Co. (C. C. A.) 13 F.(2d) 808; North Coast Stevedoring Co. v. United States (C. C. A.) 17 F.(2d) 874, are cited. It points to the language of the conditional sales contract:

"The Purchaser hereby undertakes and agrees to keep said vessels free and clear of liens throughout the period they may be in his possession, and while the title thereto remains in the Seller."

Appellees on the other hand, in support of their construction of the contract, rely upon the language of subsection (e):

"Such bills of sale to be made by the Seller and delivered to the Purchaser upon completion of the payment of the purchase price, shall convey title to each of said vessels 'as is, where is,' but must contain the usual warranty that they are free, and clear of all liens as of the date of this agreement, *but subject to such liens, if any, as may be created during the time they are in the possession of the purchaser, * * *"*

The contract under consideration in United States v. Carver, 260 U. S. 482, 43 S. Ct. 181, 182, 67 L. Ed. 361, contained no such provision as appears in the contract before us.

The two decisions, The South Coast, 251 U. S. 523, 40 S. Ct. 233, 64 L. Ed. 386, and United States v. Carver, supra, determine our disposition of this question.

Proctors seemingly differ just like ordinary lawyers. Appellant's proctors confidently rely upon the Carver Case, while appellees are equally certain the decision in the South Coast Case governs. They are seemingly uncertain whether the two decisions can be reconciled.

The court in the Carver Case, distinguished, or at least attempted to distinguish, the contracts in the two cases. It said:

"But it is said that the charter-party if known would have shown that the master at least, if not the agent who ordered the supplies, had authority to impose a lien, since the charter-party contemplated the possibility of one being created and provided for its re-moval. The *South Coast,* * * * is cited as establishing the position. But there is a sufficient difference in the language employed there and here to bring about a different result. In The *South Coast* the contract went no farther than to agree to discharge liens within a month. Here the primary undertaking was that 'the charterers will not suffer nor permit to be continued any lien,' * * * We read this as meaning will not suffer any lien nor permit the same to be continued. Naturally there are provisions for the removal of the lien if in spite of the primary undertaking one is imposed or claimed. But the primary undertaking is that a lien shall not be imposed."

The contract before us differs from both agreements considered in these two cases.

We are convinced that an agreement, to exclude liability for liens created by the master, must be so worded as to necessitate the construction that a lien may not be created. In short the agreement must *expressly deny* to the vendee authority to create a lien.

In the case before us the purchaser agreed to "keep said vessel free and clear of liens." While it must be admitted that the word "keep" is suggestive of origin of lien as well as prompt satisfaction of lien, it does not expressly negative all power of creation of a lien, or to use the language of the Carver decision, does "not *suffer* any lien or permit to be continued any lien." In construing the contract before us, it is necessary to read subdivision (f) and subdivision (e) together. Reading one in the light of the other, we find no express negation of the right to create a lien. Rather do they invite the conclusion that the parties contracted that the purchaser would promptly satisfy and discharge any lien which the successful operation of the vessel might necessitate.

(b) We also dispose of question (b) in a like manner as did Judge Geiger. The power of the master to lien the boat for necessary repairs or salvage charges existing, third parties furnishing supplies or rendering salvage services are not required to investigate the master's authority. Likewise, we need not consider the evidence nor weigh the same to ascertain whether the claimants made diligent inquiry, the affirmative of which position certain appellees and appellant stoutly assert.

(c) The questions raised by inquiry (c) are not free from doubt either as to fact or law. Appellees are divided in their positions. Some of the libellants agree with appellant regarding salvage claims of Seidl, et al. In view of the findings of the court and the evi-

dence tending to support the same, we feel justified in disposing of some of appellant's contentions on the theory that its fact assumptions are erroneous.

■ We are unable to say that the services rendered were not the contributing cause of the boat's release. The fact that the rise in the waters materially helped and perhaps was more potent in producing results than the tugging of Seidl's and Angwall's boats is not a bar to recovery. In view of our conclusion that Seidl et al.'s liens are not entitled to preference over other liens, the controversy is materially narrowed and leaves but one question to be determined.

■ The court found that said libellants Seidl and Angwall agreed with the master to furnish tugs and crews at $25 per hour, and "such agreed compensation was not to be dependent upon the success of the services, but was to be paid whether or not the steamer or any of the barges were released or salvaged."

This agreement did not defeat Seidl's and Angwall's liens although it destroyed their asserted status as salvors and their liens as salvage liens. The Camanche, 8 Wall. 448, 19 L. Ed. 397; The Excelsior, 123 U. S. 40, 8 S. Ct. 33, 31 L. Ed. 75; Merritt & Chapman Derrick & Wrecking Co. v. United States, 274 U. S. 611, 47 S. Ct. 663, 71 L. Ed. 1232. In other words, Seidl and Angwall not only had a valid claim for a definite sum of money, but they had a lien therefor on the vessel or the proceeds realized from its sale. The lien, however, was not entitled to preference among lienors, a status which under certain conditions and circumstances is accorded to one who holds a pure salvage claim. Great Lakes Towing Co. v. St. Joseph-Chicago S. S. Co., 253 F. 635 (C. C. A. 7).

■ (d) The court apportioned the balance of the proceeds derived from the sale of the property, after paying expenses and seamen's labor, among all the twelve libellants equally, each receiving a dividend of 72% on his claim. Among the libellants who complain of this are those who assert a superior position because they were salvors or because their services were rendered last. The claims of three of these libellants are so small that the difference between 72% and 100% would not justify the further expense incident to a remanding of the case. Their appeal presents a case of *damnum absque injuria*.

As to the salvage claims of Seidl and Angwall, the same conclusion might be reached in view of their securing an agreement whereby their services to the extent of $500 were to be paid by a third party. Moreover, their claims were allowed in an amount which approaches the maximum compensation for the minimum of services.

Inasmuch as we have sustained the findings of the court as to the amounts and value of the services, however, we cannot now avoid the question here presented by compromising the facts which we have just accepted as a verity.

It is apparent that the District Court placed all lien claims in the same class and pro-rated the available funds equally among them. We approve of this disposition of funds and claims.

The vessel was navigating on the Great Lakes only. All claims were created between August 14 and November 4, 1933. They all arose out of the exigencies of a single trip. Where the salvors worked for a fixed compensation and were to be paid regardless of the success of their efforts, their liens should not be given priority over liens in favor of the other claimants, all of which arose out of a single trip on the Great Lakes. City of Tawas (D. C.) 3 F. 170, 172; The J. W. Tucker (D. C.) 20 F. 129; The Steam Dredge (C. C. A.) 204 F. 262; The John J. Freitus (D. C.) 252 F. 876.

The decree is affirmed.